BOLIN, Justice.
Smith’s Sports Cycles, Inc. (“Smith”), appeals from a judgment in a nonjury trial in favor of American Suzuki Motor Corporation (“Suzuki”) on Smith’s claim that Suzuki wrongfully terminated the parties’ franchise agreement.

I. Facts and Procedural History

Smith and Suzuki entered into a written franchise agreement, effective February 14, 1989, authorizing Smith to operate a Suzuki dealership in Tuscaloosa. Pursuant to the franchise agreement, Suzuki supplied motorcycles, all-terrain vehicles, and utility vehicles manufactured by it to Smith, who, in turn, sold those products to the general public. Smith also sold the products of other manufacturers.
*684 On April 17, 2006, Suzuki sent Smith a “Notice of Default and Opportunity to Cure.” The notice listed six areas of the parties’ franchise agreement as to which Suzuki deemed Smith to be in default, mostly dealing with the appearance of Smith’s dealership facility. Suzuki demanded that Smith take certain actions to cure the default within 180 days. On June 27, 2006, Suzuki sent another letter to Smith stating that Smith remained in default of the franchise agreement because Smith had taken none of the requested actions.
On October 20, 2006, Suzuki issued a “Notice of Termination” to Smith, informing Smith that it intended to terminate the franchise agreement based, in part, on the appearance of and the deteriorating condition of Smith’s dealership facility. Smith subsequently sued Suzuki, alleging that the nonrenewal or termination of the franchise agreement constituted a breach of the franchise agreement and that the termination was in violation of the Alabama Motor Vehicle Franchise Act, § 8-20-1 et seq., Ala.Code 1975 (“the Franchise Act”). The trial court conducted a 12-day bench trial. After hearing the evidence, the trial court entered a judgment in favor of Suzuki on Smith’s breach-of-contract claim, concluding that there was not substantial evidence that Suzuki had breached any provision of the franchise agreement. The trial court also entered a judgment in favor of Suzuki on Smith’s claim that Suzuki had violated the Franchise Act. The trial court noted in its judgment that the franchise agreement “is terminated effective 42 days from the entry of this judgment.” Smith appeals.

II. Standard of Review

“When evidence is presented ore tenus, the trial court is ‘ “unique[ly] positioned] to directly observe the witnesses and to assess their demeanor and credibility.’” Ex parte T.V., 971 So.2d 1, 4 (Ala.2007) (quoting Ex parte Fann, 810 So.2d 631, 633 (Ala.2001)). Therefore, a presumption of correctness attaches to a trial court’s factual findings premised on ore tenus evidence. Ex parte J.E., 1 So.3d 1002, 1008 (Ala.2008)....
“ ‘However, the ore tenus standard of review has no application to a trial court’s conclusions of law or its application of law to the facts; a trial court’s ruling on a question of law carries no presumption of correctness on appeal.’ Ex parte J.E., 1 So.3d at 1008 (citing [Ex parte] Perkins, 646 So.2d [46,] 47 [(Ala.1994)], and Eubanks v. Hale, 752 So.2d 1113, 1144-45 (Ala.1999)). This Court ‘ “review[s] the trial court’s conclusions of law and its application of law to the facts under the de novo standard of review.” ’ Id. (quoting Washington v. State, 922 So.2d 145, 158 (Ala.Crim.App.2005)).”
Espinoza v. Rudolph, 46 So.3d 403, 412 (Ala.2010).

III. The Franchise Act

“The purpose of the [Franchise] Act is clear. It is to protect the state’s citizens from abuses by motor vehicle manufacturers and dealers, and, to that end, to regulate manufacturers and dealers and the dealings between manufacturers and their dealers.” Sutherlin Toyota, Inc. v. Toyota Motor Sales USA, Inc., 549 So.2d 460, 461 (1989). Section 8-20-5 of the Franchise Act governs cancellations, modifications, and terminations of franchise relationships; it states, in pertinent part:
“(a) Notwithstanding the terms, provisions, or conditions of any agreement or franchise or notwithstanding the terms or provisions of any waiver, no manufacturer shall cancel, terminate, *685 modify, fail to renew, or refuse to continue any franchise relationship with a licensed new motor vehicle dealer unless the manufacturer has:
“(1) Satisfied the notice requirement of this section.
“(2) Acted in good faith as defined in this chapter.
“(B) ... [G]ood cause for the cancellation, termination, modification, nonrenewal, or noncontinuance.
“(b) Notwithstanding the terms, provisions, or conditions of any agreement or franchise or the terms or provisions of any waiver, good cause shall exist for the purposes of a termination, cancellation, modification, nonrenewal, or non-continuance when:
“(1) There is a failure by the new motor vehicle dealer to comply with a provision of the franchise which provision is both reasonable and of material significance to the franchise relationship, provided that the manufacturer first acquired actual or constructive knowledge of such failure not more than 180 days prior to the date on which notification is given by the manufacturer pursuant to the requirements of this section.
“(c) The manufacturer shall have the burden of proof for showing that it has acted in good faith, that the notice requirements have been complied with, and that there was good cause for the franchise termination, cancellation, modification, nonrenewal, or noncontinuance.”
(Emphasis added.)

IV. Discussion

The trial court determined that Suzuki provided sufficient evidence demonstrating that Smith had violated two provisions of the parties’ franchise agreement: Section 1.4, dealing with the appearance and maintenance of the dealership facility, and Section 3.3, dealing with the service area and equipment. Additionally, the trial court concluded that Suzuki had complied with the requirements of § 8-20-5. The dis-positive issue on appeal is whether Suzuki met the requirements set forth in § 8-20-5 for termination of a franchise relationship.
Section 3.3 of the franchise agreement states:
“Section 3.3 Service Area and Equipment. [Smith] shall maintain an appropriate sized service department which shall be painted, neat and properly organized to insure efficient operation and inspire consumer confidence. [Smith] shall equip this department with the appropriate and necessary shop equipment, furniture, Suzuki ‘Special’ tools and those tools used in normal day to day operations.”
Suzuki’s April 17, 2006, letter to Smith regarding Section 3.3 asking Smith to take certain actions to cure what it termed a default states, in pertinent part:
“Smith is in breach of these provisions because the service department is not of an appropriate size, is not painted, and is not neat and properly organized. [Smith] is also in breach of these provisions because the assembly and set-up guides for Suzuki products are poorly organized and not in use; the assembly and set-up area is littered with debris and old parts; tools are not stored neatly when not in use; Suzuki PDI [prede-livery-instruction] certificates are not organized separately from other manufacturers; assembly guides and bulletins are not in binders and available for setup staff; warranty parts are not easily identifiable and are difficult to locate; *686 and the warranty parts retention area is disorganized, inefficient and messy.”
The letter went on to list the actions Smith needed to take within 180 days to “cure” the default:
“3. Each technician work area will be kept neat[,] clean and organized.
“4. The work areas will be located within easy access of the receiving area, vehicle storage, exits and parts supply. “5. A technician work in progress storage area will be provided.
“6. The work areas shall include, at a minimum, a workbench, tool storage, vehicle lifts, trash cans, air outlets, electrical outlets, and non-skid floor space.
“7. Parts stored around the service office and entrance should be cleared away.
“8. Debris and all non-warranty parts should be thrown out.
“9. Warranty parts area should be established and designated by manufacturer.
“10. Parts over 120 days from claim paid should be thrown out.
“11. All other parts should be tagged with full information for easy identification.”
The trial court stated the following regarding the service area of the dealership facility and the equipment addressed in Section 3.3 of the franchise agreement:
“The evidence established that [Smith] did not comply with these reasonable provisions. It was further established that the failure to organize the area led to set-up errors and a failure to perform recall or remedial repair work on equipment that could lead to safety hazards. This was a breach of the agreement that was not cured as reasonably required. The notice provision was met, the action was taken in good faith, and there was good cause for the termination under this ground.”
Section 1.4 of the franchise agreement states:
“Section 1.4 Appearance and Maintenance. [Smith’s] place of business will at all times be maintained so as to present a good image for [Smith] and Suzuki. It is [Smith’s] responsibility to maintain an attractive store for the benefit of the customer, [Smith], and Suzuki. [Smith] acknowledges that modern marketing studies show that an attractive, well-lighted, neat and clean store will attract more customers and contribute more to the development and growth of [Smith’s] business.”
Suzuki’s “cure” letter, dated April 17, 2006, states:
“Within 180 days of the date of receipt of this letter, the showroom, both sales offices, and the service area will be cleaned and all materials, parts and tools organized and neatly stored. All POP [point-of-purchase display material] will be properly, and neatly, displayed. All nonfunetioning lighting fixtures will be replaced or repaired, and [Smith] will propose a plan to [Suzuki] to upgrade and/or replace the current lighting system. In addition, all motorcycles and other debris on the surrounding property [will] be removed ... and/or properly disposed of, or stored.”
In its letter dated October 20, 2006, terminating the franchise agreement, Suzuki provided the reasons it contended Smith remained in breach of the franchise agreement:
“[Smith] is in breach of this provision because the showroom is not well lighted, or neat and clean. In addition, the two sales offices are not organized and are littered with papers. There is miscellaneous POP scattered on the show *687 room floor, especially in the area between the sales offices. As outlined in detail in section VI below, the service area is also not neat and clean. Also, the property surrounding the dealership facility is littered with more than 100 motorcycles in various states of disas-sembly and repair. [Smith] has not cleaned the showroom, the two sales offices, or the service area. Parts and tools are not organized or neatly stored. There are nonfunctioning light fixtures and [Smith] has not proposed a plan to American Suzuki to upgrade and/or replace the current lighting system. The property surrounding the facility is still littered with disassembled and/or broken motorcycles.”
Smith argues on appeal that the trial court improperly applied § 8-20-5(b)(1), Ala.Code 1975, which states that a manufacturer may terminate a dealer franchise provided the manufacturer “first acquired actual or constructive knowledge of such failure not more than 180 days prior to the date on which notification is given by the manufacturer.” In other words, § 8-20—5(b)(1) requires that a manufacturer not premise a termination decision on a breach that is more than 180 days stale before notice is given. Smith points out that Suzuki gave notice of termination of the parties’ franchise agreement on October 20, 2006. However, Smith maintains that Suzuki had notice of the appearance issues and the deteriorating condition of the dealership as early as January 2005, clearly more than 180 days before it gave Smith notice of the termination of the franchise agreement.
The trial court stated the following regarding Smith’s argument:
“[Smith] argues (rightly so) that the [Franchise Act] prohibits a manufacturer from terminating an agreement if it does not take prompt action when it first learns of a default under the agreement. Stated otherwise, the manufacturer may not use a stale breach or default to terminate a franchise agreement, defined as one that occurred more than 180 days prior to notification. But appearances that were acceptable or tolerated in 1985 may not be in 2006, as the standards and expectations of the consumer may evolve. So long as the requests for modifications are reasonable and made in good faith, the contract must be followed. Here, under the particular facts of this case, the deficiencies under § l.k and § 3.3 of the agreement were both continuous and evolving, and the 180-day requirement of § 8-20-5(b)(1) was met.
“The evidence supports the reasons given for termination. [Smith] specifically acknowledged that ‘an attractive, well-lighted, neat and clean store will attract more customers and contribute more to the development and growth of [Smith’s] business.’ § 1.4. [Smith] believed that the way it presented products in 1985 would be sufficient for 2006 and beyond. Suzuki disagreed, and repeatedly tried to get [Smith] to change the appearance of the business to increase sales of Suzuki products. [Smith] rejected virtually all efforts to change the way it presented and sold Suzuki products, including turning down incentives and declining cooperative advertising funds. Consistent with this position, [Smith] refused to make substantive changes to the appearance of the dealership as required, including refusing to remove or dispose of old unworkable motorcycles and debris from an area outside the building. While [Smith] believed such action was unwarranted and unnecessary, Suzuki established that its request regarding appearance and maintenance was reasonable *688 and consistent with the obligations in the franchise agreement.
“Suzuki could have chosen to ignore the appearance issues, and perhaps would have done so if sales were acceptable. But the franchise agreement obligated [Smith] to conform to reasonable requests for improvements to at least make an effort to sell more Suzuki products. The response of [Smith] to the notice was consistent — it defiantly contested any efforts by Suzuki to modify the presentations of products. [Smith] perhaps believed any changes would be futile, but the contract at least obligated it to make reasonable attempts to accommodate the reasonable requests. This was not done, and consequently, there was a breach of § 1.4 that was not cured. The notice provisions was met, the action was taken in good faith, and there was good cause for the termination under this ground.”
(Emphasis added.)
Although Alabama state courts have yet to address the time-notification requirement set forth in § 8-20-5 as it relates to continuous and evolving breaches, other courts whose jurisdictions have similar statutes have addressed the issue. See, e.g., Walters v. Chevron U.S.A., Inc., 476 F.Supp. 353, 357 (N.D.Ga.1979), aff'd, 615 F.2d 1135 (5th Cir.1980) (“[T]ime limitations are imposed to preclude a franchisor from basing termination or nonrenewal upon ‘old and long-forgotten events.’ ”). In Walters, the federal district court addressed the issue of an ongoing repeated violation of a franchise agreement between Walters and Chevron, requiring Walters to maintain its service-station premises, including its bathrooms, in good appearance and in a clean and orderly condition. The court acknowledged that the first violations occurred more than 120 days before Chevron gave its notice of termination.[1] Walters argued that notice under those circumstances was, therefore, untimely. The court disagreed, preferring to treat each instance of noncompliance as a separate violation. See also Gruber v. Mobil Oil Corp., 570 F.Supp. 1088, 1092 (D.C.Mich.1983) (“The time limitation is intended ‘to preclude a franchisor from basing termination or non-renewal upon old and long forgotten events.’ ”). In Mobil Oil, Gruber, the franchisee, failed to abide by the hours-of-operation provision of the parties’ lease agreement and failed to operate its service station in a clean, safe, and healthful manner. Mobil sent Gruber a notice of termination. Gruber argued that the notice was untimely because Mobil first acquired knowledge of the violations more than 120 days before the notice of termination.[2] The court rejected Gruber’s argument, reasoning that the 120-day provision
“is intended to ‘preclude a franchisor from basing termination or non-renewal upon old and long forgotten events.’ [Citation omitted.] When the alleged failure to conform with the lease is ongoing, occurring within and prior to the 120-day limitation, then the breaching event is not considered stale, but rather, viewed as a new ground for terminating the relationship each time the franchisee fails to comply.... If the Court were to rule otherwise, then either (1) a franchisee’s carelessness or willful breach will be rewarded if it continues beyond the time period, or (2) franchisors will be encouraged to terminate all breaches of the lease within 120 days of its first *689 occurrence without giving the franchisee the opportunity and time to make reasonable efforts to remedy a breach.”
Mobil Oil, 570 F.Supp. at 1092. See also Amoco Oil Co. v. D.Z. Enters., Inc., 607 F.Supp. 595, 602 (E.D.N.Y.1985) (“[I]t is clear ... that the trademark violations are ongoing and continuing, and not one or two isolated incidents.... Again, where there are repeat occurrences of the violative conduct, each new event is a ground for termination.”).
In the instant case, the appearance problems with Smith’s dealership began to occur a number of years before Suzuki gave notice of its intent to terminate the franchise agreement. Those problems were brought to Smith’s attention on different occasions by Suzuki’s representatives, who apparently tried to work with Smith on correcting the problems. Jim Gotham, Suzuki’s former district sales manager, testified that Smith’s dealership facility was deteriorating in 2001 and that it continued to deteriorate until Gotham left Suzuki in 2008. Tom Decker, Suzuki’s regional sales manager, testified that the appearance of Smith’s dealership facility continued on a downward spiral and that it got progressively worse from 2005 through 2006. Four different Suzuki representatives visited Smith’s dealership in June 2006 to monitor the appearance issues and to urge Smith’s compliance with the franchise agreement. Smith, however, declined to make any of Suzuki’s requested changes. Photographs introduced at the trial depicted the following: crates and debris stacked on the side of the service building; the side entrance blocked with trash, clutter, and debris; garbage and debris scattered in the parking lot; oil leaking from a tank into the parking lot; trash piled high in the area behind the dealership; disorganized and cluttered desks; overturned batteries and old containers leaking contents onto the ground; disorganized tools; etc. Because the appearance problems with Smith’s dealership were both evolving and continuous, Suzuki is not precluded from terminating the franchise relationship based on the fact that it had knowledge of those problems 180 days before giving actual notice of termination. To hold otherwise would allow Smith to continue to operate the dealership in a manner inconsistent with, and in violation of, the franchise agreement.
The trial court further determined that Suzuki had good cause for terminating the franchise relationship and that Suzuki acted in good faith in terminating the franchise relationship. Section 1.4 of the franchise agreement specifically states that Smith’s dealership “will at all times be maintained so as to present a good image for [Smith] and Suzuki.... [Smith] acknowledges that modern marketing studies show that an attractive, well-lighted, neat and clean store will attract more customers and contribute more to the development and growth of [Smith’s] business.” Section 9.3 of the franchise agreement provides that Suzuki may terminate the franchise agreement based on Smith’s “failure to keep the dealership in a proper state of repair and in an orderly, clean and attractive condition and appearance.” Section 8-20-5(b)(l) of the Franchise Act states that “good cause shall exist for the purposes of a termination” when “[t]here is a failure by the [dealer] to comply with a provision of the franchise which provision is both reasonable and of material significance to the franchise relationship.” Clearly, the provision of the franchise agreement requiring Smith to keep the dealership in an attractive, neat, and clean condition is both reasonable and material to the parties’ franchise relationship. See, e.g., Weisenburger v. Amoco Oil Co., 534 F.Supp. 673, 676 (D.C.N.D.1982) (“Amoco’s cleanliness and appearance standards were *690 material, reasonable and essential to the development and maintenance of its public image and marketing strategy.”).
The Franchise Act also requires that a manufacturer act in good faith when terminating a franchise relationship:
“Good faith under the [Franchise] Act means: ‘Honesty in fact and the observation of reasonable commercial standards of fair dealing in the trade as is defined and interpreted in paragraph (l)(b) of Section 7-2-103.’ § 8-20-3(7), Code of Alabama (1975). Section 7-2-103(l)(b) is the definitional section of Alabama’s Uniform Commercial Code. It provides that ‘ “good faith” in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade.’ ”
Carroll Kenworth Truck Sales, Inc. v. Kenworth Truck Co., 781 F.2d 1520, 1528-29 (11th Cir.1986). Moreover, the issue whether a manufacturer acts in good faith in seeking to terminate a franchise agreement is an issue for the trier of fact. 781 F.2d at 1528-29.
Suzuki sought to terminate the parties’ franchise relationship based on alleged breaches of six sections of the franchise agreement. The trial court, after hearing the evidence, determined that Smith had breached only two sections of the franchise agreement — Section 1.4 and Section 3.3, which required Smith to keep its dealership facility in general, and its service department in particular, neat, clean, and well organized. The fact that the trial court determined that Smith had not violated the other four sections as alleged by Suzuki does not mean that Suzuki did not act in good faith in alleging those grounds as a basis for seeking termination. The trial court’s determination that Suzuki acted in good faith is subject to the ore tenus rule, and the trial court’s decision regarding Suzuki’s good faith is supported by the record.
Based on the foregoing, the judgment of the trial court terminating the parties’ franchise relationship is due to be affirmed. Smith also argues on appeal that the trial court exceeded its discretion when, at the close of all the evidence, it entered a judgment as a matter law on Smith’s breach-of-contract claim. This argument is without merit. Smith alleged in its complaint that Suzuki’s nonrenewal or termination of the franchise agreement constituted a breach of that agreement. Smith’s breach-of-contract claim was predicated on an alleged breach by Suzuki. As the trial court noted, “there is no substantial evidence that [Suzuki] breached any provision of the agreement which resulted in any damage to [Smith].” Accordingly, the trial court’s judgment in favor of Suzuki on Smith’s breach-of-contract claim is also due to be affirmed.
AFFIRMED.
WOODALL, STUART, MURDOCK, and MAIN, JJ., concur.
MALONE, C.J., recuses himself.

. The statute at issue in Walters, 15 U.S.C. § 2802(b)(2)(A)(i), has a 120-day notice provision.

. Mobil Oil involved the same statute as Walters. See supra note 1.